IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHNNY BROOKS,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>ANDREW SAUL, Commissioner of Social Security,[1]<br><br>　　　　Defendant. | Case No. 18-cv-06958-MMC<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Doc. Nos. 19, 20 |

Before the Court is plaintiff Johnny Brooks' ("Brooks") motion for summary judgment, filed May 29, 2019, by which Brooks seeks review of a decision issued September 16, 2015, by an administrative law judge ("ALJ"), denying his claim for Social Security supplemental security income ("SSI"). Also before the Court is the cross-motion for summary judgment, filed June 26, 2019, by defendant, the Commissioner of Social Security ("Commissioner"). Pursuant to Civil Local Rule 16-5, the motions have been submitted on the papers without oral argument. Having read and considered the parties' respective written submissions, the Court rules as follows.

**BACKGROUND**

On December 15, 2014, Brooks filed an application for SSI, alleging a period of disability beginning August 13, 1997,[2] based on numerous physical and mental

---

[1] Andrew Saul, Commissioner of Social Security, is substituted herein for his predecessor, Nancy A. Berryhill, who served as Acting Commissioner of Social Security. See Fed. R. Civ. P. 25(d).

[2] Brooks subsequently amended the onset date from August 13, 1997 to December 14, 2014, the date of his application.

impairments. On September 16, 2015, the Social Security Administration denied Brooks' application and, on January 11, 2016, denied his request for reconsideration. Subsequently, Brooks requested a hearing before an ALJ. On June 15, 2017, the ALJ conducted a hearing, at which Brooks, as well as a vocational expert ("VE"), testified.

In response to questions by the ALJ, Brooks testified he had been experiencing "chronic pain" in his foot since the "early '90s,"[3] back and stomach problems, as well as headaches, "within five years" of the hearing, and dizziness, nausea, and fainting within "maybe three or four years" of the hearing. (See Certified Administrative Record ("CAR") 38.) Brooks further testified he had been experiencing emotional problems after "[b]eing incarcerated" for over a year-and-a-half from 2013 to 2014 "for a crime [he] didn't commit." (See id. 37; 41.)[4] In response to questions by his attorney, Brooks described his symptoms, including difficulty with standing, walking, sitting (see id. 46), sleeping (see id. 47), remembering, and concentrating (see id. 48-49).

Following Brooks' testimony, the ALJ posed a series of employment hypothetical questions to the VE, inquiring about Brooks' ability to perform "medium work,"[5] without any additional limitations (see id. 53-54), and "light work,"[6] with and without additional

---

[3] Brooks also testified that from approximately "1999 to 2012" he had received SSI based on the "same kind of" foot pain. (See CAR 46-47.)

[4] A form titled "Disability Determination Explanation," and dated September 15, 2015, indicates Brooks' earlier SSI was "[t]erminated [in] 2/2014 due to incarceration." (See id. 61.)

[5] The SSA defines "medium work" as follows: "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." See 20 C.F.R. § 404.1567(c); see also SSR 83-10, 1983 WL 31251, at *6 (explaining "a full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday.")

[6] The SSA defines "light work" as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity

2

limitations (see id. 54-55). In response, the VE identified three jobs in the "medium" category, specifically, "aircraft cleaner," "packager," and "grocery store bagger." (See id. 54.) In the "light" category, the VE identified three jobs, specifically, "janitor," "advertising material distributor," and "usher and ticket taker." (See id. 54-55.) As an additional job in the "light" category, the VE identified "advertising material distributor," assuming, as an additional limitation, that Brooks need "respond appropriately to supervisors, coworkers and the public only occasionally." (See id. 55.) Lastly, in response to follow-up questions from Brooks' attorney, as to the impact of various additional hypothetical limitations, the VE testified "there would be no work." (See id. 56-57.)

On November 24, 2017, the ALJ issued his decision, finding, based on the five-step sequential evaluation process set forth in the Code of Federal Regulations,[7] Brooks was not disabled. At step one, the ALJ determined Brooks had not engaged in substantial gainful activity for the claimed period. (See id. 17.) At step two, the ALJ found Brooks had one "severe impairment," namely "back disorder" (see id.); the ALJ also found Brooks had "affective mood disorder," but found such impairment was "nonsevere" (see id.). At step three, the ALJ determined Brooks did not have an impairment or combination of impairments that met or equaled a listed impairment (see id. 21); in so determining, the ALJ found Brooks had "mild limitation" in "interacting with others" and "adapting or managing oneself" (see id. 18).

---

or inability to sit for long periods of time." See 20 C.F.R. § 404.1567(b); see also SSR 83-10, 1983 WL 31251, at *5 (explaining "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.")

[7] "The five-step process for disability determinations begins, at the first and second steps, by asking whether a claimant is engaged in 'substantial gainful activity' and considering the severity of the claimant's impairments. If the inquiry continues beyond the second step, the third step asks whether the claimant's impairment or combination of impairments meets or equals a listing under 20 C.F.R. pt. 404, subpt. P, app. 1 and meets the duration requirement. If so, the claimant is considered disabled and benefits are awarded, ending the inquiry. If the process continues beyond the third step, the fourth and fifth steps consider the claimant's 'residual functional capacity' in determining whether the claimant can still do past relevant work or make an adjustment to other work." See Garrison v. Colvin, 759 F.3d 995, 1007 (9th Cir. 2014) (quoting Kennedy v. Colvin, 738 F.3d 1172, 1175 (9th Cir. 2013)) (internal citations omitted).

Before continuing to step four, the ALJ determined Brooks' "residual functional capacity" ("RFC")[8] and, in that regard, found Brooks could perform "medium work as defined in 20 CFR [§] 416.967(c)," specifically, "lifting and/or carrying 50 pounds occasionally and 25 pounds frequently; sitting for six hours out of an eight-hour workday[;] standing and/or walking six hours out of an eight-hour workday; and pushing and/or pulling as much as lifting and/or carrying." (See id. 21.) At step four, the ALJ found "[t]ransferability of job skills is not an issue because [Brooks] does not have past relevant work." (See id. 25.) Lastly, at step five, the ALJ, relying on the VE's testimony, found Brooks, in light of his "age, education, work experience, and [RFC]," could perform the "medium" jobs of "aircraft cleaner," "packager," and "grocery store bagger," (see id. 25-26), and, based thereon, denied Brooks' application.

Thereafter, Brooks requested the Appeals Council ("AC") review the ALJ's decision. On September 21, 2018, the AC denied review, explaining it had considered the reasons Brooks disagreed with such decision and said reasons "d[id] not provide a basis for changing" the decision. (See id. 1.)

On November 16, 2018, Brooks filed the instant petition for review.

## STANDARD OF REVIEW

"An ALJ's disability determination should be upheld unless it contains legal error or is not supported by substantial evidence." Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and . . . resolving ambiguities." Id.

---

[8] RFC is "the most [the claimant] can still do despite [his] limitations." See 20 C.F.R. § 404.1545(a)(1); see also SSR 96-8p, 1996 WL 374184, at *1 (explaining "[o]rdinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis," i.e., "8 hours a day, for 5 days a week, or an equivalent work schedule").

4

The court "review[s] only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which [the ALJ] did not rely." See Garrison, 759 F.3d at 1010. The court must consider "the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion," see Andrews, 53 F.3d at 1039, and "must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation," see id. at 1039–40.

"Even when the ALJ commits legal error," the court must "uphold the decision where that error is harmless." See Brown-Hunter v. Colvin, 806 F.3d 487, 492 (9th Cir. 2015) (internal quotation, citation, and alteration omitted). "An error is harmless only if it is inconsequential to the ultimate nondisability determination." See id. at 494 (internal quotation and citation omitted).

**DISCUSSION**

In his motion for summary judgment, Brooks contends, inter alia, the ALJ erred in rejecting, with respect to mental limitations, the opinions of Katherine Wiebe, Ph.D., ("Dr. Wiebe"), a clinical psychologist who served as his consultative examiner, and John Edwards, L.C.S.W., ("Edwards"), his treating therapist; with respect to physical limitations, Brooks contends the ALJ erred in rejecting the opinion of Michael Wang, M.D., ("Dr. Wang"),[9] his treating physician. As a result, Brooks argues, the ALJ's step-five finding that he could perform other work is not supported.[10]

**A.  Dr. Wiebe's Opinion**

Reviewing courts "'distinguish among the opinions of three types of physicians: (1)

---

[9] In his decision, the ALJ misspells "Wang" as "Wong." (See CAR 24.)

[10] Brooks also argues the ALJ, at step two, erred in finding only one "severe" physical impairment. (See Mot. at 7:24.) Because any such error was harmless, see Buck v. Berryhill, 869 F.3d 1040, 1048-49 (9th Cir. 2017) (holding "[s]tep two is merely a threshold determination meant to screen out weak claims"; finding error in step-two analysis was harmless where "step two was decided in [the claimant's] favor"), the Court does not further address herein the ALJ's step-two finding. To the extent Brooks further argues the ALJ, at step three, erred in not finding his mental impairments constitute a listed impairment (see Mot. at 18:19-20), the Court finds Brooks has not shown his mental impairments meet the criteria for such a finding (see infra Section A).

5

those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians).'" See Garrison, 759 F.3d at 1012 (quoting Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995)). In general, "the opinion of a treating physician is . . . entitled to greater weight than that of an examining physician," see id., and "the opinion of an examining physician is entitled to greater weight than that of a non-examining physician," see id. "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." See id.

Brooks argues the ALJ should "have assigned greater weight to the opinion of Dr. Wiebe rather than" the opinions of three other experts, namely, Jenny Forman, Ph.D., ("Dr. Forman"), a clinical psychologist who served as the Commissioner's consultative examiner, Barbara Moura, Psy.D., ("Dr. Moura"), the Commissioner's nonexamining consultant who reviewed Brooks' medical records at the initial level, and John Petzelt, Ph.D., ("Dr. Petzelt"), the Commissioner's nonexamining consultant who reviewed Brooks' medical records on reconsideration. (See Mot. at 17:4-6.)

In her "Confidential Psychological Report" dated October 26, 2016 (see CAR 465), Dr. Wiebe diagnosed Brooks with "[m]ajor depressive disorder," "[p]osttraumatic [s]tress [d]isorder," "[o]ther specified personality disorder," and "[u]nspecified neurocognitive disorder" (see id. 475-76), and identified various issues bearing on Brooks' ability "to perform [various activities] on a sustained basis in a 5 day a week, 8 hour a day, normal work setting" (see id. 478). In that regard, Dr. Wiebe found Brooks had "marked"[11] impairment of his ability to: (1) "[u]nderstand, remember and carry out detailed instructions"; (2) "[m]aintain attention and concentration for two hour segments"; (3) "[p]erform at a consistent pace without an unreasonable number and length of rest

---

[11] The form provides the following definition of "marked": "[T]he patient is unable to perform the activity on a sustained basis in a 5 day a week, 8 hour a day, normal work setting." (See id. 478.)

6

periods"; (4) "[r]espond appropriately to changes in a routine work setting and deal with normal work stressors"; and (5) "[c]omplete a normal workday and workweek without interruptions from psychologically based symptoms." (See id. 479.) In addition, Dr. Wiebe found Brooks had "moderate"[12] impairment of his ability to: (1) "[u]nderstand, remember and carry out very short and simple instructions"; (2) "[g]et along and work with others"; (3) "[i]nteract appropriately with the general public"; (4) "[a]ccept instructions and respond appropriately to criticism from supervisors"; and (5) "[m]aintain regular attendance and be punctual within customary usually strict tolerances." (See id.)

In her evaluation dated July 21, 2015, Dr. Forman diagnosed Brooks with "[d]epressive [d]isorder" (see id. 362), and found, "due to depression/anxiety," Brooks was "[m]ildly [i]mpaired" in his ability to: (1) "maintain adequate pace or persistence to perform" complex tasks; (2) "withstand the stress of an 8-hour workday"; (3) "interact appropriately with co-workers, supervisors, and the public on a regular basis"; and (4) "adapt to changes, hazards, or stressors in the workplace setting" (see id.). In her consultative report dated September 15, 2015, Dr. Moura opined that Dr. Forman's finding of "no more than mild limits is supported and given weight" (see id. 67), and, on January 11, 2016, Dr. Petzelt adopted Dr. Moura's opinion as to Brooks' mild limitations (see id. 80-81).

The ALJ gave Dr. Wiebe's opinion "little weight," explaining such findings "do[ ] not adequately take into consideration all of [Brooks'] subjective and objective symptoms, signs, limitations, and severity of condition." (See id. 20.) The ALJ gave the opinions of Dr. Forman, Dr. Moura, and Dr. Petzelt "significant weight" because, according to the ALJ, those opinions "are generally consistent in that they all assess [Brooks] had no severe mental impairments, limitations, and associated none to mild 'B' criteria." (See id.

---

[12] The form provides the following definition of "moderate": "[T]he patient has a significant loss of ability to perform the activity on a sustained basis in a 5 day a week, 8 hour a day, normal work setting." (See id. 478.)

7

21.)[13]

Given the conflict between the opinion of examining psychologist Dr. Wiebe, on the one hand, and the opinions of examining consultant Dr. Forman and nonexamining consultants Dr. Moura and Dr. Petzelt, on the other hand, the ALJ could reject Dr. Wiebe's opinion only by providing "specific and legitimate reasons . . . supported by substantial evidence." See Garrison, 759 F.3d at 1012. As set forth below, the Court finds the ALJ's reasons meet this test.

In particular, the ALJ found Dr. Wiebe had not reviewed Brooks' "entire medical record" and "was not privy to [Brooks] having improvement with treatment," as reflected in two treatment notes by Carolyn Doyle, M.D., ("Dr. Doyle"), a treating psychiatrist, specifically, Dr. Doyle's notes dated June 2016 and January 2017. (See id.) Additionally, quoting the June 2016 note, the ALJ found Brooks denied "acute psychiatric or medical concerns" and felt "less stressed out" (see id. 20; 486), and, quoting the January 2017 note, further found Brooks' mood was "stable" and that "zolpidem helps" (see id. 20-21; 480).[14] Significantly, although Dr. Wiebe evaluated Brooks in October 2016 (see id. 464), she only reviewed Dr. Doyle's psychiatric treatment records for a one-month period in 2015 (see id. 465) (stating "[r]ecords reviewed . . . dated October 29, 2015 to December 3, 2015"). Dr. Wiebe did not review Dr. Doyle's June 2016 note, and the one time she saw Brooks was prior to Brooks' January 2017 appointment with Dr. Doyle. The June 2016 and January 2017 treatment notes are of particular importance, as both no longer list memory as a symptom of Brooks' depression (see id. 480; 486), and the January 2017 note no longer lists concentration as a symptom (see id. 480).[15]

---

[13] The paragraph 'B' criteria "represent the areas of mental functioning a person uses in a work setting," namely "[u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." See 20 C.F.R. pt. 404, subpt. P, app. 1, 12.00 Mental Disorders (Mar. 14, 2018).

[14] Zolpidem, marketed under the brand name Ambien in the United States, "is used to treat insomnia." See Zolpidem, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/zolpidem-oral-route/description/drg-20061195 (last visited Jan. 27, 2020).

[15] In two earlier treatment notes from 2016, Dr. Doyle had listed "Memory" and

8

1  Under such circumstances, the Court finds the ALJ did not err in giving "little

2  weight" to Dr. Wiebe's opinion. See Andrews, 53 F.3d at 1043 (holding ALJ does not err

3  when ALJ provides "specific, legitimate reasons" for rejecting examining psychologist's

4  opinion).

**B.	Edwards' Opinions**

As a therapist, Edwards qualifies as a "medical source" subject to a regulation governing "other sources." See 20 C.F.R. § 416.913(d)(1) (effective Sept. 3, 2013–Mar. 26, 2017) (defining "other sources" to include "therapists"). "The ALJ may discount testimony from . . . 'other sources' if the ALJ gives reasons germane to each witness for doing so." Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) (internal quotation and citation omitted).

Brooks argues Edwards' opinion "should have been given significant weight because he regularly treated" him. (See Mot. at 15:17-18.) In particular, in a letter addressed to Brooks' attorney dated June 7, 2017, Edwards stated he had "provisionally assigned" to Brooks a diagnosis of either "Delusional Disorder or Autism Spectrum Disorder or both," making it "highly unlikely that . . . Brooks will be able to effectively enter the workplace." (See CAR 647; see also id. 601 (noting autism diagnosis "would be helpful with [Brooks'] SSI appeal").)

The ALJ gave Edwards' opinion "little weight," explaining such findings "are not consistent with the entire evidence of record." (See id. 20.) In that regard, the ALJ found the opinion Edwards gave in his letter to Brooks' attorney was inconsistent with Edwards' progress notes, which, contrary to his letter, reflect Edwards' medical opinion of Brooks' "functional status" as "average" (see id. 595), and that "there are no significant ways that [Brooks'] daily work, training and/or educational activities are affected in a constant way" (see id. 637).[16]

---

"Concentration" as symptoms, and noted those symptoms were "[i]mproving" (see id. 498 (Jan. 15, 2016 note); 483 (Sept. 30, 2016 note).)

[16] To the extent Edwards also noted a "limited interpersonal environment would be

9

Under such circumstances, the Court finds the ALJ did not err in giving little weight to Edwards' letter opinion.

**C.   Dr. Wang's Opinion**

Brooks argues "greater weight should have been [given] to the opinion of Dr. Wang based on his treating relationship" (see Mot. at 17:22-23); Brooks further argues the opinions of Eugene McMillan, M.D., ("Dr. McMillan"), an internist who served as the Commissioner's consultative examiner, and F. Wilson, M.D., ("Dr. Wilson"), the Commissioner's nonexamining consultant who reviewed Brooks' medical records, "should not have been given 'significant weight' by the ALJ" (see id. at 17:20-22).

In a doctor's report dated July 8, 2015, Dr. Wang diagnosed Brooks with "plantar fasciitis" (see CAR 357)[17] and stated Brooks could stand and walk for "less than" two hours in an eight-hour workday (see id. 358).

In an evaluation dated July 22, 2015, Dr. McMillan opined that Brooks could stand and walk for "at least" six hours in an eight-hour workday. (See id. 368.) Similarly, in an assessment dated January 5, 2016, Dr. Wilson opined that Brooks could stand and walk for "[a]bout" six hours in an eight-hour workday. (See id. 82.)

The ALJ gave Dr. Wang's opinion "little weight" because, according to the ALJ, Dr. Wang's findings "are not consistent with the entire evidence of record." (See id. 24.) In that regard, the ALJ found (1) Brooks' pain was, according to a January 2017 treatment note, "relieved with ice, ibuprofen, and previous injections," (2) Brooks

---

best suited for [Brooks] at this time" (see id. 637), such preference was implicitly acknowledged by the ALJ's posing to the VE a hypothetical claimant who need "respond appropriately to supervisors, coworkers and the public only occasionally" (see id. 55).

[17] "Plantar fasciitis is an inflammation of the fibrous tissue (plantar fascia) along the bottom of [the] foot that connects [the] heel bone to [the] toes. Plantar fasciitis can cause intense heel pain." See Plantar fasciitis, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/plantar-fasciitis/diagnosis-treatment/drc-20354851 (last visited Jan. 27, 2020). Plantar fasciitis is diagnosed based on physical examination; "[u]sually no tests are necessary," but testing, such as x-rays or magnetic resonance imaging, can "make sure another problem . . . is not causing [the] pain." See id.

10

"received routine . . . conservative physical medical treatment including being prescribed similar medications as noted above, diagnostic testing, and physical examinations," (3) Brooks' "diagnostic testing and physical examinations throughout the record noted no more than mild findings," (4) Brooks "had no significant treatment following . . . right flank mass surgery in July 2015," and, (5) Brooks was "capable of transporting himself via his son giving him rides, borrowing his son's car and driving, Uber, or taking the bus," in addition to "cleaning himself, cleaning the bathtub, and making his bed." (See id.)[18]

By contrast, the ALJ gave the opinions of Dr. McMillan and Dr. Wilson "significant weight" because, according to the ALJ, those opinions "are generally consistent in that they all assess [Brooks] is able to perform a range of work at the medium exertional level with some differences in the degree of specific function-by-function limitations." (See id. 25.)

Given the conflict between the opinion of treating physician Dr. Wang, on the one hand, and non-treating physicians Dr. McMillan and Dr. Wilson, on the other hand, the ALJ could reject Dr. Wang's opinion only by providing "specific and legitimate reasons . . . supported by substantial evidence." See Garrison, 759 F.3d at 1012.

Although the ALJ did provide reasons for rejecting Dr. Wang's opinion, those reasons were, in part, based on an erroneous characterization of the record. First, the ALJ misread the 2017 treatment note, which was prepared by Mira Elnan, M.D., ("Dr. Elnan"), the doctor who treated Brooks in 2016 and 2017 and documented Brooks' right heel pain. The ALJ described that note as stating Brooks' pain was "relieved" with ice, ibuprofen, and previous injections (see CAR 24), whereas, Dr. Elnan in fact found Brooks' pain, in particular, his heel pain, was "unrelieved with ice, ibuprofen, and previous injections." (See id. 541.) Second, the ALJ, relying on Brooks' receipt of "similar medications" to the above three, characterized Brooks' treatment as "conservative" (see

---

[18] For the same reasons, the ALJ rejected Brooks' "statements concerning the intensity, persistence and limiting effects of [his] symptoms." (See id. 23-24.)

id. 24), but failed to acknowledge Dr. Elnan's having prescribed gabapentin for Brooks' heel pain in January 2017. (See id. 542 (diagnosing "[p]lantar fasciitis of right foot" and "treat[ing] heel pain with gabapentin for now").)[19] Moreover, even after Brooks was given that prescription medication, Christina Pratt, DPM, in a podiatric treatment note dated February 22, 2017, found "pain on palpation of R[ight] plantar heel." (See id. 533.)

The ALJ's remaining reasons for rejecting Dr. Wang's opinion likewise fail. The ALJ's reliance on the results of Brooks' "diagnostic testing and physical examinations" (see id. 24), as "no more than mild," is misplaced. Plantar fasciitis is not shown on tests; rather, as noted above, tests are used to eliminate other possible causes of the patient's symptoms. As also noted above, plantar fasciitis can cause "intense heel pain," see Plantar fasciitis, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/plantar-fasciitis/diagnosis-treatment/drc-20354851 (last visited Jan. 27, 2020), and nowhere in the record of Brooks' examinations is his heel pain described as "mild." Next, although, Brooks, as the ALJ found, received "no significant treatment" after "right flank mass surgery" in July 2015, the flank is "the part of the body below the rib and above the ilium," the uppermost part of the hip bone, see Flank Pain, NAT'L CTR. FOR BIOTECH. INFO., https://www.ncbi.nlm.nih.gov/books/NBK292/ (last visited Jan. 27, 2020), and, consequently, has no bearing on Brooks' claim of heel pain. Lastly, activities such as Brooks' "transporting himself via his son giving him rides, borrowing his son's car and driving, Uber, or taking the bus" are not inconsistent with Dr. Wang's diagnosis of plantar fasciitis and specified limitations as to standing and walking, nor are such household chores as "cleaning himself, cleaning the bathtub, and making his bed" (see id. 24).

---

[19] "Gabapentin works in the brain to . . . relieve pain for certain conditions in the nervous system. It is not used for routine pain caused by minor injuries." See Gabapentin, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/gabapentin-oral-route/description/drg-20064011 (last visited Jan. 27, 2020). Gabapentin is prescribed to treat nerve pain associated with plantar fasciitis. See, e.g., Brian Fullem, DPM, Case Studies In Treating Chronic Plantar Fasciitis, PODIATRY TODAY, Nov. 2013, at 46-50, https://www.podiatrytoday.com/case-studies-treating-chronic-plantar-fasciitis (last visited Jan. 27, 2020).

Under the circumstances, the Court finds the ALJ erred in rejecting Dr. Wang's opinion. See Garrison, 759 F.3d at 1012 (holding ALJ errs when ALJ does not provide "specific, legitimate reasons" for crediting one medical opinion over another).[20]

Moreover, such error is not harmless. As noted above, the ALJ found Brooks could perform "medium work," including standing and walking for six hours in an eight-hour workday (see CAR 21) and, based thereon, the ALJ, at step five, found Brooks could perform three jobs categorized as "medium work," see Dict. of Occ. Titles (4th ed. 1991) ("DOT") § 919.687-014 (aircraft cleaner); id. § 920.587-018 (packager); id. § 920.687-014 (grocery store bagger). The full range of "medium work" requires, as noted, standing and walking for "approximately" six hours in an eight-hour workday, see SSR 83-10, 1983 WL 31251, at *6, whereas Dr. Wang opined Brooks could only stand and walk for "less than" two hours in an eight-hour workday.

Although, as also noted above, the VE, in response to a hypothetical question posed by the ALJ, identified three jobs categorized as "light work," see DOT § 323.687-014 (janitor); id. § 230.687-010 (advertising material distributor); id. § 344.667-010 (usher and ticket taker), the full range of "light work" likewise requires standing and walking for "approximately" six hours in an eight-hour workday, see SSR 83-10, 1983 WL 31251, at *5, and, consequently, like medium work, is not in accord with the limitations specified by Dr. Wang.

Lastly, as no hypothetical question was posed to the VE that included those limitations, the VE was never given the opportunity to offer an opinion as whether any jobs exist for which Brooks is qualified and wherein such limitations could be accommodated.

---

[20] For the same reasons this Court finds the ALJ erred in rejecting Brooks' statements as to the severity of his heel pain. See Burrell v. Colvin, 775 F.3d 1133, 1136 (9th Cir. 2014) (holding, where claimant "has presented evidence of an underlying impairment and the government does not argue that there is evidence of malingering, [the court] review[s] the ALJ's rejection of [the claimant's] testimony for specific, clear and convincing reasons") (internal quotation and citation omitted).

13

1    In sum, the Court finds the ALJ erred in not adequately including the limitations Dr.
2    Wang identified, and that such error was not harmless.

**D.    Remedy**

Brooks requests the Court remand his claim for an award of benefits or, in the alternative, for further proceedings. In support of the former, Brooks contends that, "if the improperly discredited evidence were credited as true, it is clear that the ALJ would be required to find Mr. Brooks disabled on remand." (See Mot. at 22:12-14).

"A remand for an immediate award of benefits is appropriate . . . only in rare circumstances," see Brown-Hunter, 806 F.3d at 495 (internal quotation and citation omitted), namely, where the following three "requirements" are met: "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand," see Garrison, 759 F.3d at 1020. Even if such requirements are met, however, "[t]he decision whether to remand a case for additional evidence or simply to award benefits is in [the reviewing court's] discretion." See Treichler v. Comm'r of Soc. Sec., 775 F.3d 1090, 1101–02 (9th Cir. 2014) (internal quotation and citation omitted).

As to the initial requirement, the Court notes "[a]dministrative proceedings are generally useful where the record has [not] been fully developed, there is a need to resolve conflicts and ambiguities, or the presentation of further evidence . . . may well prove enlightening in light of the passage of time." See id. at 1101 (alteration in original; internal quotations and citations omitted); see also Brown-Hunter, 806 F.3d at 495 (explaining "[t]he touchstone for an award of benefits is the existence of a disability, not the agency's legal error").

Here, the Court finds further proceedings may well serve a "useful purpose." See Garrison, 759 F.3d at 1020. As discussed above, the Court has found the ALJ erred in determining Brooks could perform "medium work" and in asking the VE to assume

14

Brooks could perform that category of work or at least "light work." The record has not been developed, however, as to whether Brooks' physical limitations could be accommodated in another category of work, such as "sedentary work." See 20 C.F.R. § 404.1567(a).[21] Moreover, given the passage of time since the last medical note contained in the record, and the indication therein of continuing evaluation (see CAR 533 (directing patient "to set up MRI appt")), additional relevant evidence may be available for consideration. Accordingly, the Court finds it appropriate to remand for further proceedings.

## CONCLUSION

Brooks' motion for summary judgment is hereby GRANTED, the Commissioner's cross-motion for summary judgment is hereby DENIED, and the action is hereby REMANDED, under sentence four of 42 U.S.C. § 405(g), for further proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: February 12, 2020

MAXINE M. CHESNEY
United States District Judge

---

[21] To the extent Brooks argues the "Grids" are, in his case, determinative of disability, the record bearing on such issue has not been fully developed. To the extent Brooks, based on additional limitations his attorney posed in a hypothetical question to the VE at the hearing, may be contending there is no work available for him (see CAR 56-57), the Court notes such assumed limitations are not supported by any findings in the medical records provided.

15